IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 1, 2024 Session

## STATE OF TENNESSEE v. JAMES PHILLIP RICKMAN

**Appeal from the Circuit Court for Lake County**
**No. 20-CR-10717    Tony A. Childress, Chancellor**

———————————————————

**No. W2022-01272-CCA-R3-CD**

———————————————————

A Lake County jury convicted the Defendant, James Phillip Rickman, of one count of attempted first degree premeditated murder resulting in serious bodily injury, one count of employing a firearm during the commission of a dangerous felony, and three counts of aggravated assault.  The trial court imposed an effective sentence of twenty-one years in the Tennessee Department of Correction.  On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions for attempted first degree murder with serious bodily injury and one count of aggravated assault; and (2) the trial court erred when it dismissed his motion to suppress.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and JILL BARTEE AYERS, JJ., joined.

Charless Agee, Dyersburg, Tennessee (at trial); and Brennan M. Wingerter, Assistant Public Defender – Appellate Director, Franklin, Tennessee (on appeal), for the appellant, James Phillip Rickman.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Danny H. Goodman, Jr., District Attorney General; and Lance E. Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant shooting his son, Joshua Rickman. Joshua Rickman,[1] was married to Kayla Rickman and the couple shared one six-year-old child, N.R.[2] Joshua had three children from a previous marriage: Shelby, age eighteen; J.R., age fifteen; and D.R., age fifteen. Kayla had two children from a prior relationship: C and J. All the children lived with Joshua and Kayla except for J.R. and D.R. The underlying dispute between the Defendant and Joshua was about J.R. and D.R, who had lived with the Defendant and his wife for most of their lives due to Joshua's and his ex-wife's drug use. A Lake County grand jury indicted the Defendant for attempted first degree premeditated murder resulting in serious bodily injury, employing a firearm during the commission of a dangerous felony, aggravated assault of his son, Joshua Rickman, aggravated assault of his daughter-in-law, Kayla Rickman, and aggravated assault of his grandson, N.R.

On the morning of trial, before jury selection, the Defendant lodged an oral motion to suppress the Defendant's statements made to law enforcement. The Defendant's attorney stated he wanted to file a motion to suppress based on a violation of the Fifth Amendment right against self-incrimination. The trial judge and the parties moved outside the presence of the jury into the hallway, and the State argued that it was not prepared to argue the motion due to the last-minute notice, referencing Rule 12 of the Tennessee Rules of Criminal Procedure. It appears there may have been some discussion held among the parties that is not included in the transcript. Nonetheless, the trial court denied the motion "because it would put the State in a prejudicial position for not being able to prepare for and have their witnesses together." After jury selection, the trial proceeded, and we summarize the evidence presented therein.

On Christmas Eve 2019, J.R. and D.R. were at Joshua and Kayla's residence. Joshua believed the boys were to spend the night and then the entire family would go to the Defendant's house the next day on Christmas. The Defendant had a different understanding and arrived at Joshua's house demanding that J.R. and D.R. go home with him. The argument escalated, and Joshua called the Obion County Sheriff's Department to assist in removing the Defendant from Joshua's property.

The following day, Joshua and his family went to the Defendant's residence as planned at around noon. Joshua denied that there had been any discussion about the family shooting guns that day. The children opened Christmas gifts, and, at some point, Kayla, Joshua, and the Defendant went out to the shed to retrieve bicycles that were Christmas gifts for the boys. The Defendant and Joshua went inside the shed and engaged in normal

---

[1] The Defendant and the victims share the same surname so, for purposes of clarity, we will refer to the family members by their first names. In so doing, we intend no disrespect to the parties.

[2] It is the policy of this court to refer to minors by their initials.

familial conversation with no mention of the previous day's argument. The Defendant asked Joshua if he wanted some lanterns and Joshua indicated that he did but would take them the next time he was at the Defendant's when he had more room in his vehicle. After fifteen to twenty minutes, Joshua stepped outside the shed and bent down to pick up a cat. Kayla was outside the shed with N.R. standing in front of her. N.R. began speaking to Joshua when the Defendant called Joshua back inside the shed. Joshua set the cat down and turned his attention to N.R. when "next thing [he] kn[e]w, [he] got shot in the back." Joshua felt "a burning pain" when the bullet moved through his shoulder, and he fled to his neighbor's house. Joshua did not yet know the extent of his injuries, but he felt the blood running down his side.

Joshua was transported to Dyersburg Regional Medical Center where he was released at about 7:30 p.m. The bullet entered Joshua's back and exited right above his armpit, causing some nerve damage. He lost the feeling in his left arm for about two months before he could resume using his arm. The bullet did not hit any organ or bones, and his treatment did not require rehab or surgery; however, Joshua lost his job as a diesel truck mechanic because he could no longer perform two of his required duties due to his shoulder injury. Since then, Joshua obtained employment at Triple T Tire, doing a job that accommodated his limitations. At the time of trial, Joshua still experienced "tingling in [his] fingers all the time, like they're asleep."

Joshua believed the Defendant generally had been a "kind, gentle, reasonable, nonviolent person." The Defendant had no prior involvement with the police, but Joshua had prior arrests for domestic assault and possession of drugs.

Ridgely Police Department ("RPD") Sergeant Brandon Bishop responded to a "shots fired" call at the Defendant's residence. Shelby met Sergeant Bishop at the patrol car door notifying him that Joshua, her father, had been shot. Sergeant Bishop located the Defendant at the edge of his shed behind the house. Sergeant Bishop approached the Defendant with his weapon drawn. The Defendant followed Sergeant Bishop's commands and told Sergeant Bishop that the gun, a .38 Smith and Wesson, was in his back right pocket. Sergeant Bishop unloaded the gun and then placed the Defendant in handcuffs "for safety purposes." The gun had "four rounds that were live and one spent cartridge still inside the cylinder." Sergeant Bishop wore a bodycam during the course of his interactions at the shooting scene.

Lexie Smith lived across the street from the Defendant. On Christmas morning, the Defendant's wife, Denise Rickman, asked Ms. Smith if she could borrow her pistol. Denise explained that the family planned to "go down to the levee and shoot guns" after opening Christmas gifts. The family only had shotguns and Denise wanted to learn to shoot a pistol. Ms. Smith loaned Denise her five-shot .38 Smith and Wesson after showing Denise how

to properly use the weapon. The gun was fully loaded when Ms. Smith gave it to Denise; however, Ms. Smith offered Denise additional ammunition. Denise responded that "five shells would be enough." After the shooting, Ms. Smith identified the gun collected by the police from the Defendant's back pocket as her gun.

Ms. Smith had known Joshua for many years and believed Joshua had a reputation for violence based upon domestic assault arrests and the fact that Joshua "was constantly jumping on [the Defendant]." The Defendant, however, had a reputation for being kind, gentle, and generous.

Shelby was sixteen years old at the time of these events and living with Joshua and Kayla. On Christmas day 2019, she and her family went to the Defendant's home to celebrate Christmas with her grandparents. When they arrived, the Defendant directed them to the living room where the presents were located. At some point, the Defendant and Joshua went outside to get presents that were stored in the shed. N.R. ran outside after Joshua, and Denise told Shelby to go outside and get N.R. because she did not want him to ruin "the surprise." Shelby went outside to call N.R. back in the house. As she stood on the steps of the house, Kayla and N.R. stood in the yard, Joshua was exiting the shed, and the Defendant was inside the shed. N.R. was "about to start walking" toward Shelby when "the gun went off."

Joshua, who was unarmed, began yelling, "You shot me," and ran through the neighbor's (Carol Morgan) backyard to another neighbor's (Cotton Baker) house. Shelby "freaked out" and began "screaming" that she was going to call the police. The Defendant told Shelby "that if [she] was to say anything, he was going to end up shooting [her], too." Shelby called 911.

During Kayla and Joshua's nine-year marriage, D.R. and J.R. had primarily lived with the Defendant, with occasional visits to the home Kayla shared with Joshua. Kayla was unaware of any discussion of the living arrangements changing even though the boys spent Christmas Eve at Joshua and Kayla's house. According to Kayla, the boys were to return to their grandparents' home the following day on Christmas.

As planned, the family went to the Defendant's residence in Ridgely to celebrate Christmas. Kayla did not know of any plan to go to the levee and shoot guns on Christmas. The familial interactions appeared normal to Kayla, and she did not perceive anyone was angry nor did she hear Joshua threaten or provoke the Defendant. When the family arrived at the Defendant's house, the children went directly to the living room where they waited to open presents. The children began opening presents and, at some point, the Defendant, Kayla, and Joshua went outside to retrieve bicycles for the boys. The Defendant and Joshua went inside the shed while Kayla remained just outside the shed where she could hear the

two men talking about routine things. The Defendant showed Joshua the pecans he had shelled that were "in the deep freeze." Then the two men discussed two lanterns that were in the shed. Kayla and Joshua rolled the bikes out and then Joshua went back into the shed. N.R., who was then four, had come outside by this time. Kayla and N.R. stood two to three feet from the shed when Joshua walked out of the shed and picked up a cat. The Defendant called Joshua back in the shed, Kayla heard a pop, and Joshua came out of the shed, holding "himself," and saying, "He shot me." Joshua then ran to a neighbor's house.

The Defendant exited the shed holding a gun. He pointed it at Kayla, stating he would shoot her too. Kayla begged the Defendant not to shoot her, and the Defendant turned the gun on N.R. saying, "I kill that em-ef-er (phonetic) too." Kayla jumped in front of N.R. and pushed him down to protect him from any gunfire. Kayla was genuinely afraid that the Defendant would shoot her and/or N.R. By this point, D.R. had come out of the house and was asking the Defendant questions about what had occurred. To which, the Defendant responded, "shut up, or I'll kill you too."

Both the Defendant and Joshua would get upset at times but would usually "calm down after they talk[ed] it out." Kayla agreed that Joshua had a reputation for violence and that she had requested police intervention in their home when Joshua had grabbed her hand and twisted it.

Several Lake County residents testified on the Defendant's behalf that the Defendant was mild-mannered, kind, gentle, and quick to help others.

After hearing this evidence, the jury convicted the Defendant as charged of one count of attempted first degree premeditated murder resulting in serious bodily injury, one count of employing a firearm during the commission of a dangerous felony, and three counts of aggravated assault. The trial court imposed an effective sentence of twenty-one years of confinement. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his convictions and that the trial court erred in denying his motion to suppress. The State asks us to affirm the trial court in all respects.

### A. Motion to Suppress

The Defendant contends that the trial court erred when it dismissed his oral motion to suppress as untimely. The State asks us to affirm the trial court's denial of the motion.

The Rules of Criminal Procedure mandate that a motion to suppress "must be raised prior to trial." Tenn. R. Crim. P. 12(b)(2). Courts have interpreted the phrase "prior to trial" to mean "sometime earlier than 'the day of the trial when the jury is waiting in the hall.'" *See State v. Hamilton*, 628 S.W.2d 742, 744 (Tenn.Crim.App.1981) (quoting and approving of interpretation of Rule 12(b) by trial judge); *State v. Clark*, 67 S.W.3d 73, 76 (Tenn. Crim. App. 2001) ("[D]efendant was obligated to file a motion to suppress evidence on such a basis before the day of trial."). Failure to timely raise a suppression issue results in waiver. Tenn. R. Crim. P. 12(f). However, the trial court for cause shown may grant relief from the waiver. *Id*.

The rationale behind Rule 12(b) is discussed in *Feagins v. State*, 596 S.W.2d 108 (Tenn. Crim. App. 1979), and *State v. Davidson*, 606 S.W.2d 293 (Tenn. Crim. App. 1980). This court in *Feagins*, supra, stated:

> [The practice of requiring pre-trial motions] avoids interrupting a trial in progress [and] . . . inconveniencing jurors and witnesses by requiring them to stand by idly while the court hears a motion to suppress. It is to the advantage of both the prosecution and defense to know prior to trial whether certain items will or will not be admitted into evidence. Granting the pre-trial motion might result in abandonment of the prosecution; if the pre-trial motion is denied, then the defendant may either plead guilty and gain whatever concession might be obtained from the State, or change his trial strategy.

The *Davidson* court stated the broad discovery rules now used make it a rare incidence for the defense not to be aware of evidence which will be introduced at trial. For this reason, compliance with Tennessee Rule of Criminal Procedure 12 should be the rule rather than the exception.

As the State correctly notes, even though the oral motion to suppress was made before the jury was sworn, the motion was made on the day of trial while the jury pool was in the courtroom. Therefore, the timing of the suppression motion caused the probability of inconveniencing jurors and presumably witnesses as stated in *Feagins*. Additionally, the State did not receive adequate notice to be prepared to litigate the suppression issue. Accordingly, the trial court did not err in dismissing the motion.

The Defendant, in his reply brief, asks this court to review the issue under plain error review. We decline to do so. Considering the weight of the evidence against the Defendant, consideration of this issue is not "necessary to do substantial justice." *State v. Smith v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). Any alleged error was not of sufficient

magnitude that it "probably changed the outcome of the trial." *State v. Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016). The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

On appeal, the Defendant asserts that the State's evidence was insufficient as to his conviction for attempted first degree murder with serious bodily injury and aggravated assault of N.R.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds*). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "strongest legitimate view of the evidence" contained in the record, as well as "all reasonable and legitimate inferences" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

### 1. Attempted First Degree Murder with Serious Bodily Injury

In order to convict Defendant of attempted first degree murder with serious bodily injury, the State had to prove that Defendant acted "with the kind of culpability otherwise required for the offense . . . [and] [a]ct[ed] with intent to cause a result that is an element of the offense, and believe[d] the conduct w[ould] cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. § 39-13-202(a)(1). While serious bodily injury is not an element of attempted first degree murder, when a victim of attempted first degree murder suffers serious bodily injury as a result of the crime, a defendant must serve a minimum of 85% of his sentence. T.C.A. § 40-35-501(k)(5). "Serious bodily injury" includes bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; or (E) protracted loss or substantial impairment of function of a bodily member, organ or mental faculty. . . . T.C.A. § 39-11-106(a)(36). "Protracted" means "delayed or prolonged in time." *State v Ronald L. Carroll*, No. E2013-01781-CCA-R3-CD, 2014 WL 1759101, at *5 (Tenn. Crim. App. Apr. 30, 3014), *perm. app. denied* (Tenn. Oct. 15, 2014). According to Tennessee Code Annotated section 39-11-106(a)(3) "bodily injury" includes a "cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." This court has held that the subjective nature of pain is a fact to be determined by the trier of fact. *State v. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

The evidence, viewed in the light most favorable to the State, shows that the Defendant, through his wife, procured a weapon from a neighbor prior to Joshua's arrival at his home. The Defendant and Joshua went out to the shed, and when Joshua attempted to leave, the Defendant called him back and shot the victim. The bullet entered Joshua's back and exited the front of his body right above his arm pit. With blood streaming down his side, Joshua fled to a neighbor's home. The Defendant rendered no aid to the unarmed victim, nor did he call 911 for medical help. The victim was transported to the hospital for treatment, lost use of his left arm for two months, and at the time of trial, almost two years later, still had residual nerve damage to the arm.

The Defendant does not attack any element of the first degree murder offense. He only argues that the State failed to prove "serious bodily injury." The distinction between bodily injury and serious bodily injury is generally a question of fact for the jury to determine. *See State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). Joshua testified that the bullet struck his back, causing a burning sensation. This court has previously noted that "a gunshot wound to the upper torso of the body, almost without fail, constitutes a substantial risk of death given the number of vital organs in that region of the body." *State v. Sullivan*, No. M2004-03068-CCA-R3-CD, 2006 WL 644021, at *8 (Tenn. Crim. App. Mar.10, 2006).

The Defendant relies upon our supreme court's decision in *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012), in which our court clarified the definition of serious bodily injury and held that a gunshot wound does not necessarily cause bodily injury that involves "a substantial risk of death." In that case, the victim was shot in the leg and the bullet passed through the victim's leg. The wound required minimal medical treatment and did not cause the victim to suffer a loss of consciousness, extreme pain, disfigurement, or impairment. The court noted that hospital records classified the victim's pain as "mild" to "moderate" and that the victim did not testify as to the degree of pain he experienced. *Id*. at 101. Our supreme court ultimately concluded that the gunshot wound did not meet the statutory definition of "serious bodily injury" because the injury, as it occurred, did not involve a substantial risk of death, the victim did not lose consciousness, the victim did not suffer extreme pain, and because nothing in the victim's testimony supported an inference that his injury involved protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. *Id*. at *4-5.

We conclude that this case is distinguishable from *Farmer*, in that Joshua suffered a protracted loss or substantial impairment of a function of a bodily member, and that the State proved the necessary elements of "serious bodily injury." Joshua testified that he was shot in the back and that the bullet traveled through his body, causing a burning sensation. Joshua's hospital treatment was not prolonged, but he lost the use of his left arm for two

months, causing his employer to release him due to his inability to complete the required tasks of his job. Before the shooting, Joshua was a diesel mechanic. Due to limitations caused by his injuries, he sought employment at Triple T Tires.

The Defendant argues that loss of the use of an arm for two months is not sufficient to support a protracted loss. We disagree. This Court has found protracted loss of use of a body part when the victims suffered impairment for four to twelve weeks. *See State v. London*, No. W2017-01396-CCA-R3-CD, 2018 WL 3996886, at *1-4 (Tenn. Crim. App. Aug. 21, 2018) (forearm placed in a cast for six weeks) *no perm. app. filed; State v. Beauregard*, No. M2012-02312-CCA-R3-CD, 2013 WL 6047026, at *15 (Tenn. Crim. App. Nov. 14, 2013) (fractured elbow required four to twelve weeks to heal with the aid of a splint and then a cast); *State v. Johnson*, No. W2002-01333-CCA-R3-CD, 2003 WL 22794530, at *2 (Tenn. Crim. App. Nov. 18, 2003) (a severe limp for two months after the injury, and weakness in the victim's leg two years after the offense). In this case, the victim lost the use of his arm for two months. Almost two years after the injury, he still experienced a tingling sensation in his arm.

The distinction between bodily injury and serious bodily injury is generally a question of fact for the jury to determine. *See Barnes*, 954 S.W.2d at 765-66. Accordingly, we conclude that the evidence is sufficient for the jury to find, beyond a reasonable doubt, the Defendant guilty of attempted first degree murder resulting in serious bodily injury.

## 2. Aggravated Assault

The Defendant was charged with intentionally or knowingly causing N.R., his then four-year-old grandson, to reasonably fear imminent bodily injury through the use or display of a deadly weapon. *See* T.C.A. § 39-13-102(a)(1)(A)(iii). Aggravated assault based on fear requires the victim to have a "well-grounded apprehension of personal injury or violence." *State v. Jones*, 789 S.W.2d 545, 550-51 (Tenn. 1990). Circumstantial evidence is sufficient to establish a victim's fear of imminent bodily injury. *State v. Austin*, No. W2001-00120-CCA-R3-CD, 2002 WL 32755555, at *5 (Tenn. Crim. App. Jan. 25, 2002). "The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." *State v. Whitfield*, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998) (citing *State v. Pittman*, No. 03C01-9701-CR-00013, 1998 WL 128801, at *5 (Tenn. Crim. App. Mar. 24, 1998)). Even though a victim does not testify about being afraid, as was the case here, "a victim's fear may be inferred from the circumstances surrounding the offense." *State v. Whited*, No. M2005-00167-CCA-R3-CD, 2006 WL 548228, at *12 (Tenn. Crim. App. Mar. 7, 2006), *perm. app. denied* (Tenn. Aug. 28, 2006).

The evidence, viewed in the light most favorable to the State, showed that N.R., the four-year-old victim, followed his mother outside to where his grandfather, the Defendant, and father, Joshua, were in a shed. The Defendant fired a gun at Joshua while N.R. stood a short distance away. Joshua began yelling that he'd been shot and fled. N.R.'s older sister, Shelby, began yelling that she would call the police. The Defendant exited the shed holding the gun, pointed it at N.R.'s mother, threatened her, then threatened to shoot N.R. N.R.'s mother jumped in front of N.R. and knocked him to the ground. This is sufficient evidence from which any rational trier of fact could have found the essential elements of an aggravated assault against N.R., beyond a reasonable doubt. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE